IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BAPTIST MEMORIAL HOSPITAL, d/b/a<br>BAPTIST MEMORIAL HOSPITAL - MEMPHIS,<br>6019 Walnut Grove Road<br>Memphis, Tennessee 38120<br><br>               Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, Secretary,<br>United States Department of Health & Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>SERVE: MICHAEL O. LEAVITT, Secretary,<br>         U.S. Dept of Health & Human Services<br>         200 Independence Avenue, S.W.<br>         Washington, D.C. 20201<br><br>               Defendant. | Civil Action Number: |

## COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

The above-named Plaintiff, by and through its undersigned counsel, states the following

by way of its Complaint against Michael O. Leavitt, Secretary of the United States Department

of Health and Human Services (the "Secretary" or the "Defendant").

### I.    Cause of Action

1.    Plaintiff Baptist Memorial Hospital, d/b/a Baptist Memorial Hospital - Memphis

("Baptist-Memphis") is a not-for-profit hospital, owned and operated by the Baptist Memorial

Health Care Corporation ("BMHCC"). Baptist-Memphis, along with other BMHCC hospitals,

participates in the Medicare and Medicaid programs. Baptist-Memphis brings this action for an

order setting aside the Secretary's reversal of the decision of the Provider Reimbursement

Review Board ("PRRB" or "the Board") in Baptist-Memphis' favor, and thereby compelling the

Secretary to follow the plain language of his own Medicare regulations and payment instructions

for purposes of calculating Baptist-Memphis' Medicare reimbursement for its fiscal year ("FY")

1995 with respect to two separate issues, as follows:

> **Issue 1:** Whether the Centers for Medicare & Medicaid Services ("CMS")
> properly disallowed Baptist-Memphis' request for an exception to the Medicare
> Skilled Nursing Facility ("SNF") routine inpatient cost limits ("RCL") authorized
> under 42 C.F.R. § 413.30(c), filed on the basis of a revised Notice of Program
> Reimbursement ("revised NPR" or "RNPR").

> **Issue 2:** Whether Baptist-Memphis is entitled under CMS Program
> Memorandum ("PM") A-99-62 to include the Social Security Act, Section 1115
> waiver days for the expanded Medicaid populations (a/k/a "Tenncare") days in
> the Medicaid component of the disproportionate share hospital ("DSH")
> adjustment calculation.[1]

2. On August 30, 2007, the PRRB issued a unanimous decision in Baptist-Memphis'

favor with respect to both of the aforementioned issues. First, the PRRB held that because the

regulation governing SNF RCL exception requests "makes no distinction between original and

revised NPRs and provides no basis upon which to limit relief under a request," Baptist-

Memphis "may properly make an RCL exception request for the full amount of any NPR in

which the RCL is at issue." PRRB Dec. No. 2007-D65, at 8-9. Second, the PRRB held that

Baptist-Memphis is entitled to relief under Medicare Program Memorandum A-99-62 issued by

the Secretary, because "the Provider filed a jurisdictionally proper appeal to the Board before the

---

[1] This issue for FYE 9/30/95 is controlled by the same issue for FYE 9/30/94 raised in a related
case currently pending before this Court entitled *Baptist Memorial Hospital d/b/a Baptist
Memorial Hospital–Memphis v. Leavitt*, case number 1:07-cv-01938-RWR.

COMPLAINT
Page - 2 -

October 15, 1999 deadline established by PM A-99-62." *Id.* at 9.  The PRRB ordered the Secretary to recalculate Baptist-Memphis' DSH allowance to recognize inpatient days of care which Baptist-Memphis had provided to individuals who were entitled to expanded Medicaid coverage under the State of Tennessee's Medicaid program, also known as "TennCare."  On October 29, 2007, the Deputy Administrator of the Centers for Medicare & Medicaid Services ("CMS") reversed the PRRB's decision as to both issues.

## II.    Jurisdiction and Venue

3.    This action arises under: (a) Title XVIII of the Social Security Act, as amended (42 U.S.C. § 1395 *et seq.*), which establishes the Medicare Program; and, (b) the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* (the "APA") (*see also* 5 U.S.C. §§ 701-706).

4.    Pursuant to 42 U.S.C. § 1395oo(f)(1), this Court has jurisdiction to review the final decision rendered by the Administrator of CMS, acting as the Secretary's delegate.  42 U.S.C. § 1395oo(f) also provides for venue in this Court.  This Court has authority to grant the relief requested under 42 U.S.C. § 1395oo(f)(1) and the APA.

## III.    Parties

5.    The Plaintiff is Baptist-Memphis Memorial Hospital, Inc. (formerly d/b/a Baptist-Memphis Memorial Hospital Medical Center-East) (Medicare Provider No. 44-0048), which is a non-profit hospital that provides inpatient services at 6019 Walnut Grove Road, Memphis, Tennessee 38120.  At all times relevant to this case, Baptist-Memphis participated in the Medicare Program and operated a "hospital" as defined in 42 U.S.C. § 1395x(e) and 42 C.F.R. § 489.2(b)(1).

6.     The Defendant is Michael O. Leavitt, the Secretary of the Department of Health and Human Services, or his successor in office. The Secretary is the federal officer responsible for the administration of the Medicare Program pursuant to the Social Security Act. The Secretary has delegated administration of the Medicare Program to CMS.

## IV.    Regulatory Background Related to Medicare Reimbursement Appeals

7.     Title XVIII of the Social Security Act (hereafter "the Act") establishes the Medicare Program, which provides hospital coverage and medical insurance coverage to the aged and disabled. Under the Act, the Medicare Program makes payments on behalf of an eligible Medicare beneficiary for inpatient and outpatient hospital services provided to the beneficiary by a hospital participating in the Medicare program as a "provider of services" (as that term is defined at 42 U.S.C. § 1395x(u)).

8.     Each hospital that participates in the Medicare Program files a cost report after the conclusion of its fiscal year. A hospital's cost report reflects interim payments received from the Medicare Program during that fiscal year and sets forth adjustments (as contemplated by the Medicare Program) that will result in settlement and correct payment to the hospital for the services it provided during the cost reporting year.

9.     After a hospital files its cost report, a fiscal intermediary (acting as the Secretary's agent) determines the amount of payment owed to the hospital (42 U.S.C. § 1395h). The fiscal intermediary determines the total amount of Medicare reimbursement due to the hospital, based upon detailed payment regulations and instructions promulgated by the Secretary (42 C.F.R. § 405.1803), and provides the hospital with a notice of program reimbursement ("NPR"). In determining the contents of the NPR, the fiscal intermediary looks not only to the Secretary's

COMPLAINT
Page - 4 -

regulations but also to interpretive guidance and instructions which are published by the Secretary in the form of Medicare Program manuals, memoranda and instructive letters (all of which may be relied on by a hospital when filing its cost report as well). The NPR states the net amount due to the hospital from the Medicare program (or vice versa) based upon the fiscal intermediary's reconciliation of interim payments and year-end adjustments.

10. The Act establishes a review process for fiscal intermediaries' Medicare reimbursement determinations. A hospital may appeal an intermediary's decision on an NPR to the PRRB. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. A hospital may also appeal an intermediary's final determination on a SNF RCL exception request. 42 C.F.R. § 413.30(c)(2). The PRRB has jurisdiction over appeals from determinations by fiscal intermediaries if: (a) a hospital is dissatisfied with the fiscal intermediary's final determination; (b) the amount in controversy is over $10,000; and, (c) the provider requests a hearing within 180 days after receiving the NPR from the fiscal intermediary. 42 U.S.C. § 1395oo(a): Hospitals under common ownership or control must appeal issues involving a common question of fact or interpretation of law, regulations or CMS Rulings as a group. See 42 C.F.R. §§ 405.1837 and 405.1841(a)(2). Such groups are generally referred to as common-issue/related-party or "CIRP" group appeals.

11. The Secretary has established regulations which govern the PRRB appeals process. See 42 C.F.R. § 405.1835 through § 405.1871. The PRRB has established its own instructions on procedural matters. Following the PRRB's issuance of its decision on a provider's appeal of an NPR, the CMS Administrator, on his own motion, may reverse, affirm or modify the PRRB's decision. 42 U.S.C. § 1395oo(f)(1). The Secretary has also established

COMPLAINT
Page - 5 -

regulations which govern the CMS Administrator's review of PRRB decisions. *See* 42 C.F.R. § 405.1875.

12.     A provider has a right to obtain judicial review of any final decision of the PRRB or any reversal, affirmance or modification of the PRRB's decision by the Administrator of CMS (who acts on behalf of the Secretary). 42 U.S.C. § 1395oo(f)(1).

13.     A provider also has a right, after filing its appeal with the PRRB, to request that the PRRB determine that it lacks the authority to decide a "question of law or regulations relevant to the matters in controversy." 42 U.S.C. § 1395oo(f)(1). The PRRB must issue a decision on this request, known as a request for expedited judicial review ("EJR"), within 30 days of receiving the provider's EJR request. *Id.*

14.     If the PRRB determines that it lacks the authority to decide the issue raised in the provider's EJR request, the provider may obtain judicial review by filing suit within 60 days of receipt of the PRRB's EJR decision or, if the PRRB fails to render a decision, within 60 days of the expiration of the PRRB's 30-day determination period. 42 U.S.C. § 1395oo(f)(1).

15.     The PRRB's decision to grant or deny an EJR request is final and not subject to review by the Secretary. 42 U.S.C. § 139500(f)(1).

## V.     The Skilled Nursing Facility Cost Limit and Exception

**A.     Legal Authorities**

16.     Section 1861(v)(1)(A) of the Act authorizes the Secretary to establish limits on a provider's costs. Section 1888(a) of the Act directs the Secretary to set limits on per diem inpatient routine service costs for hospital-based and freestanding SNFs by urban or rural area. In 42 C.F.R. § 413.30, the Secretary implements this legislation and describes the general

COMPLAINT
Page - 6 -

principles and procedures for limits on SNF and home health agency costs. The regulation directs CMS to establish SNF cost limits, in general, based on the "costs CMS estimates to be necessary for the efficient delivery of needed health care services." 42 C.F.R. § 413.30(a)(2). The regulation further provides that "CMS may establish estimated cost limits for direct or indirect overall costs or for costs of specific services or groups of services." Id. As specified in the CMS manual, the SNF cost limits apply to "general inpatient routine services costs," but do not apply to "capital-related costs and the costs of ancillary services, outpatient services, research, and any payment for a return on equity capital." Provider Reimbursement Manual, Part-I ("PRM-I") § 2530.2. In determining the limits, CMS computes "the average of providing services" and considers the SNF's geographical location (urban or rural) and type (hospital-based or freestanding)." PRM-I §§ 2530.3 and 2530.4.

17.     At the same time, Congress provided for exceptions or exemptions to the cost limits. *See* Final Rule, 64 Fed. Reg. 42610 (Aug. 5, 1999). As CMS reported in the preamble of a proposed rule, "[t]he Congress, however, in the House Committee report 'H.R. Rep. No. 92-231, 92nd Congress, 1st Session 5071 (1971),' stated that 'Provider's would, of course, have the right to * * * obtain relief from the effect of the cost limits on the basis of evidence of the need for such an exception.'" Proposed Rule, 63 Fed. Reg. 42797 (Aug. 11, 1998). The SNF exception process is set forth in 42 C.F.R. § 413.30(c) and (e). Under the regulation, providers can request exceptions if their costs exceed the limits as a result of one of the following situations:  atypical services; extraordinary circumstances; providers in areas with fluctuating populations; medical and paramedical education costs; and unusual labor costs. 42 C.F.R. § 413.30(e)(1)-(5). A SNF must make its request to its intermediary within 180 days of the date

of the intermediary's notice of program reimbursement. 42 C.F.R. § 413.30(c). *See also* PRM-I § 2531.1A.

**B.     Facts Specific to Baptist-Memphis' FY 1995 SNF RCL Exception Request**

18.     BMHCC owns and operates a chain of providers including a hospital-based, urban SNF located in Memphis, Tennessee, under Medicare Provider No. 44-5195. BMH-Memphis (also owned and operated by BMHCC under Medicare Provider No. 44-0048) identifies and reports the SNF costs in its cost report. The BMHCC home office (also located in Memphis, Tennessee) is assigned Medicare Provider No. 44-H046.

19.     The home office provides extensive services to its chain components, including but not limited to personnel, management, administrative, accounts payable, data processing, and payroll. The home office cost affects cost in every cost center on Baptist-Memphis' cost report, including those specific to the SNF.

20.     Baptist-Memphis' Medicare fiscal intermediary (the "Intermediary") issued an NPR for Baptist-Memphis' FY 1995 cost report on September 21, 1998. The Intermediary, however, finalized Baptist-Memphis' FY 1995 cost report using tentative and inaccurate home office costs because the BMHCC home office cost statement had not yet been finalized. After completing the BMHCC FY 1995 home office cost audit, the Intermediary reopened Baptist-Memphis' cost report to incorporate the audited home office costs and issued a revised NPR. The Intermediary made a number of adjustments to related-party costs that impacted the SNF's costs. Based upon these adjustments to home office costs related to SNF costs plus additional costs over the limits, Baptist-Memphis requested an "Atypical Services" exception to the SNF RCL on May 6, 2002, within 180 days of these adjustments to SNF costs in the revised NPR.

21.    The Intermediary denied Baptist-Memphis' exception request as untimely filed (*i.e.*, in excess of 180 days from the date of the original NPR), and Baptist-Memphis timely appealed the denial.

22.    On December 28, 2004, the Intermediary challenged the Board's jurisdiction over its denial of Baptist-Memphis' exception request. On January 13, 2006, the Board rejected the Intermediary's challenge and recognized jurisdiction over an RCL exception request based upon a revised NPR.

23.    On October 24, 2006, the PRRB held an evidentiary hearing to determine "whether Baptist-Memphis may file an exception request pursuant to a revised NPR and, if so, whether the relief granted under the exception must be limited to the scope of the revised NPR." PRRB Dec. No. 2007-D65, at 3. The PRRB hearing established a number of key undisputed facts, including but not limited to the following:

(1)    The Provider was over the SNF RCL limits. Hearing Exhibit P-5; Hearing Transcript, Testimony of Mike Shaver, 200:12-21, 204:15-17.

(2)    The Provider has proven the elements required for an exception request based on atypical costs resulting from atypical patients as required by 42 C.F.R. § 413.30(e)(1) and PRM-I § 2534 and § 2531.1A. Hearing Transcript, Opening Statement of Intermediary (Bernard Talbert) 40:3-40:9; Hearing Transcript, Testimony of Tom Hanson, 122:3-123:7, 129:22-131:16.

(3)    If the Board finds that the Provider is entitled to the entire exception request, the Intermediary agrees with the Provider that the correct amount of the exception is $83.01, which would result in additional reimbursement of $750,659. Hearing Exhibit P-38; Hearing Transcript, Testimony of Mike Shaver, 196:21-197:1, 217:21-25; Hearing Transcript, Testimony of Tom Hanson, 159:11-160:2.

(4)    If the Board rules that the Provider is entitled to an exception based on all of the costs adjusted in the revised NPR, then the Intermediary agrees with the Provider that the correct amount of the exception is $42.79, which would result in additional reimbursement of $386,950. Hearing Exhibit P-38; Hearing Transcript,

COMPLAINT
Page - 9 -

Testimony of Mike Shaver, 218:1-218:9; Hearing Transcript, Testimony of Tom Hanson, 162:14-21.

24.     On August 30, 2007, the PRRB issued its unanimous decision in favor of Baptist-Memphis, finding that the governing regulation "makes no distinction between types of NPRs and provides no basis upon which to limit relief under a request," and therefore, "a provider should be allowed to make an exception request for the full amount from any NPR in which the RCL is at issue." PRRB Dec. No. 2007-D65, at 8. The PRRB concluded that "there is no basis to limit a provider's exception request from a revised NPR," and "[t]he Provider may properly file its exception request for the full amount from the revised NPR." *Id.*

25.     On October 29, 2007, the Administrator reversed the PRRB's decision on the grounds that because "the revised NPR resulted in a negative adjustment" and "did nothing more than lower the difference between the total costs and the RCL, the Provider is not entitled to an exception to its RCL for FYE 1995 made pursuant to the revised NPR." Adm. Dec. on Review of PRRB Dec. No. 2007-D65 (Oct. 29, 2007) (hereafter "Adm. Dec."), at 8.

## VI.     Disproportionate Share Hospital Adjustment – Section 1115 Waiver Days

### A.     Legal Authorities

26.     Under the prospective payment system ("PPS"), Medicare makes payments to short-stay acute hospitals, such as Baptist-Memphis, for inpatient operating costs, based on predetermined, nationally-applicable rates. Congress has required that hospitals receiving Medicare payment may also receive certain specified payment adjustments. 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412. PPS hospitals that serve "a significantly disproportionate number of low-income patients" are eligible for one of these adjustments, known as the disproportionate share hospital or "DSH" adjustment. 42 U.S.C.

§ 1395ww(d)(5)(F)(i)(I).    If their "disproportionate patient percentage" exceeds certain thresholds, hospitals qualify for this adjustment, with the amount of the additional payment depending on the extent to which the percentage exceeds said thresholds.    42 U.S.C. § 1395ww(d)(5)(F)(v), (vii).

27.    The additional payment for the DSH adjustment is computed (for a given cost-reporting period) as the sum of two fractions.    The fraction at issue in the present case, the "Medicaid Low Income Proxy," requires a determination of the number of inpatient days for which patients who, for such days "were eligible for medical assistance [*i.e.*, Medicaid] under a State plan approved under title XIX" but who were not also entitled to Medicare Part A.    *See* 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).    The general rule is that the more Medicaid eligible inpatient days there are, the larger the DSH adjustment will be.    In essence, the statutorily-defined formula uses the number of Medicaid-eligible patients as a proxy for all low-income patients.

28.    Medicaid is a joint federal/state program administered by participating states, subject to federal requirements.    *See* 42 U.S.C. § 1396 *et seq*.    A participating state must submit a state Title XIX plan to the Secretary for approval and must operate its Medicaid program in accordance with the approved plan.    *See* 42 U.S.C. § 1396c.    The federal government then will pay federal funds to the participating state to help defray the expense of providing medical assistance to Medicaid-eligible patients.    "Medical assistance" is defined as the payment of federal Title XIX funds for part or all of the cost of benefits, such as inpatient hospital services, afforded to eligible persons.    42 U.S.C. § 1396d(a).

29.    Each state that participates in the Medicaid program administers the program and must designate a "single state agency" to do so.    42 U.S.C. § 1396a(a)(5).    The states have great

flexibility in establishing the definitions of individuals who are eligible for Medicaid. 42 U.S.C. § 1396a(a)(10)(A)(ii). As such, there is great variability between states as to eligibility for, and the scope of medical assistance benefits under, Medicaid.

30.    In addition, through Section 1115 of the Social Security Act (42 U.S.C. § 1315), Congress established a process for the Secretary to waive certain federal Medicaid requirements governing state Title XIX plans, to allow a requesting state to establish alternative eligibility and coverage standards under its Medicaid program pursuant to an experimental, pilot or demonstration project. The statute further mandates that the costs of such demonstration programs be regarded as "expenditures under the State plan" approved under Title XIX. 42 U.S.C. § 1315(a)(2)(A).

**B.    TennCare Waiver**

31.    Tennessee operates its Medicaid program under an approved Title XIX state plan, as modified by a Section 1115 Medicaid waiver. Tennessee's demonstration program, known as "TennCare," was approved for the initial period of January 1, 1994 through December 31, 1998. TennCare is a statewide demonstration project that, *inter alia*, waived the usual standards for taking into account the resources for the demonstration population. Persons who are ineligible for Aid to Families with Dependent Children or Supplemental Security Income payments will be eligible for the demonstration if they meet income requirements but they will not be subject to resource (or asset) limits. The demonstration project approval also authorizes expenditures made by the State of Tennessee to extend eligibility under TennCare to those who are uninsurable because of pre-existing conditions and to those who are uninsured. The demonstration project

COMPLAINT
Page - 12 -

approval provides that expenditures to such individuals are to "be regarded as expenditures under the State's Title XIX plan."

**C.    Background of Program Memorandum ("PM") A-99-62**

32.    In the early 1990's, the Secretary narrowly interpreted the regulation governing a hospital's DSH percentage as including only those Medicaid-eligible days for which Medicaid actually paid for the services rendered, thereby excluding inpatient days attributable to Medicaid-eligible individuals but for which Medicaid did not pay the provider.  Each court that had the opportunity to review the Secretary's position, including four different Circuit Courts of Appeal, rejected the Secretary's interpretation as violative of the clear statutory language.  *See Cabell Huntington Hospital v. Shalala*, 101 F.3d 984 (4th Cir. 1996); *Legacy Emanuel Hospital & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconess Health Serv. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *Jewish Hospital, Inc. v. Secretary of Health and Human Services*, 19 F.3d 270 (6th Cir. 1994).

33.    In 1997, as a result of the repeated judicial rejections of its position, CMS (then known as "HCFA") issued HCFA Ruling 97-2, in which CMS finally acquiesced to the Circuit Court rulings that the Medicare DSH adjustment should include all days attributable to inpatient hospital days of services for patients who were eligible on that day for medical assistance under a State Medicaid plan, regardless of whether the hospital received payment from Medicaid for the services rendered.  Despite the clear language in 42 U.S.C. § 1395ww(d)(5)(F)(vi) – that the Medicare DSH adjustment should include a "hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under the title XIX . . . " – confusion continued for CMS and its fiscal intermediaries,

for the state Medicaid programs, and for providers as to which days should and should not be included in the DSH calculation.

34.    On October 15, 1999, Michael Hash, the Deputy Administrator of CMS, wrote to Senator William Roth, Chairman of the Senate Finance Committee, and conceded that CMS' guidance on the DSH calculation, particularly with respect to including general assistance days, was "neither sufficiently clear nor well understood." In addition to assuring that new guidance would be issued on this subject, the letter assured Senator Roth that those hospitals that had received additional DSH payments due to the confusion would be held harmless; *i.e.*, the fiscal intermediaries would not recoup incorrectly made payments.    The letter also assured that "[w]here fiscal intermediaries have disallowed the portion of DSH reimbursement claimed under our insufficiently clear DSH policy, and the hospitals timely pursued their administrative remedies, the disallowance will be reversed and, where necessary, repaying (*sic*) the hospitals the amounts that had been recouped." Thus, the only requirement for relief for hospitals that had a portion of their DSH reimbursement disallowed was that they have "timely pursued their administrative remedies" – *i.e.*, timely filed an appeal at the PRRB. No mention was made in this letter of a specific cut-off date by which an appeal had to be filed or of specific language that had to be used in the letter to the PRRB establishing an appeal.

35.    On December 1, 1999, CMS issued the promised guidance in the form of a Program Memorandum to its Intermediaries. PM A-99-62. As relevant to Baptist-Memphis, PM A-99-62 clarified that "waiver or demonstration population days" should not be included in the DSH calculation, but provided relief for some hospitals as follows:

> If, for cost reporting periods beginning before January 1, 2000, a hospital that did not receive payments reflecting the erroneous inclusion of otherwise ineligible

COMPLAINT
Page - 14 -

days filed a jurisdictionally proper appeal to the PRRB *on the issue of the exclusion of these types of days from the Medicare DSH formula* before October 15, 1999, [fiscal intermediaries must] reopen the cost report at issue and revise the Medicare DSH payment to reflect the inclusion of these types of days as Medicaid days.

(*Emphasis in original.*) This policy is commonly known as the "Hold Harmless Policy" and the relief described above is referred to herein as "Hold Harmless Relief."

36.     PM A-99-62 further instructed its intermediaries that a provider was not eligible for the Hold Harmless Relief if, after October 15, 1999, it added the issue to a pending PRRB appeal "on *other* Medicare DSH issues or *other* unrelated issues."

37.     Hospitals, such as Baptist-Memphis, did not receive a copy of or notification regarding CMS' letter of October 15, 1999 to Senator Roth (described in ¶34, *supra*). Moreover, the PM was provided to intermediaries in December 1999 but not to hospitals. Tennessee hospitals were notified by their Intermediary of the application of the "hold harmless provisions of PM A-99-62 to the Tennessee expansion waiver days in a bulletin dated March 2000. It was only then that Baptist-Memphis was notified that, to be held harmless, a hospital not only must have timely filed an appeal to the PRRB on the specific issue of the exclusion of waiver days from the DSH calculation, but the appeal must have been filed prior to October 15, 1999.

**D.     Facts Specific to Baptist-Memphis' Qualification for Hold Harmless Treatment in FY 1995**

**(1)     *Baptist-Memphis' FY 1995 Individual Appeal (i.e., the Appeal at Issue in this Case)***

38.     On February 24, 2005, the Intermediary issued a revised NPR for FY 1995 that adjusted the number of Medicaid days used to calculate the Medicaid proxy portion of Baptist-Memphis' Medicare DSH qualification and payment. The adjustment excluded Section 1115 expanded waiver days from the DSH Medicaid eligible days count. By letter dated August 19,

2005, Baptist-Memphis requested a hearing before the PRRB with respect to the Intermediary's determination of Baptist-Memphis' DSH payment, including the Section 1115 Waiver Days – Hold Harmless issue.

39.     On October 24, 2007, the PRRB held an evidentiary hearing to determine whether Baptist-Memphis was entitled to hold harmless treatment under PM A-99-62 for FY 1995.  On August 30, 2007, the PRRB issued its unanimous decision in favor of Baptist-Memphis, finding that Baptist-Memphis is entitled to hold harmless treatment for FY 1995 because "the Provider filed a jurisdictionally proper appeal to the Board before the October 15, 1999 deadline established by PM A-99-62, and the Provider incurred and claimed TennCare days eligible for payment under the "hold harmless" provision of the PM."  PRRB Dec. No. 2007-D65, at 9.  In so deciding, the PRRB expressly relied on the parties' stipulations, entered into on October 20, 2006, in which the Board noted the parties' agreement to the following:

1. The Board held a hearing for Provider's FYE 9/30/94 appeal involving the same Parties and the same Section 1115 Waiver Days issue on April 26, 2006.

2. The Provider's right to hold harmless treatment in FYE 9/30/95 depends upon the Board's decision regarding the Provider's entitlement to hold harmless treatment in its FYE 9/30/94 appeal.

3. The Parties agree that the Board's decision for FYE 9/30/95 should reflect the decision reached for FYE 9/30/94.

4. The Parties agree that the Hold Harmless Policy would apply to FYE 9/30/95 if the Board finds in favor of the Provider in Case No. 98-1942 [FYE 9/30/94].

*Id.* at 8-9. Because the Board had previously determined that Baptist-Memphis' FY 1994 appeal satisfied the requirements of PM A-99-62 (PRRB Decision No. 2007-D43, June 29, 2007), and "[i]n keeping with the above agreed to stipulations," the Board held that "the Provider is entitled

to hold harmless treatment for FYE 9/30/95 in accordance with the decision reached for FYE 9/30/94, and the Intermediary is instructed to recalculate and make Medicare DSH payments based upon the inclusion of all of the excluded §1115 waiver days." *Id.* at 9.

40.    On October 29, 2007, the Administrator reversed the PRRB's decision based on his August 29, 2007 decision reversing the PRRB's decision in favor of Baptist-Memphis for its FY 1994 individual appeal, which the Administrator incorporated by reference into his decision regarding Baptist-Memphis' FY 1995 appeal. Adm. Dec. at 19, and 14 n.41.

**(2)    *Baptist-Memphis' FY 1994 Individual Appeal (i.e., Appeal Which Initially Established Qualification for Hold Harmless Treatment)***

41.    An NPR was issued for Baptist-Memphis' FY 1994 cost report by the Intermediary on September 23, 1997. As a part of the NPR, the Intermediary made various adjustments to the cost report as filed by Baptist-Memphis, including Audit Adjustment No. 49, which reduced Baptist-Memphis' number of Medicaid-eligible days used in the DSH calculation. Among other reductions to the DSH days, the Intermediary disallowed 2,020 inpatient days that were incurred by patients covered under Tennessee's federally-approved Section 1115 waiver, commonly known as "TennCare."

42.    Baptist-Memphis filed a timely request for a PRRB hearing on March 19, 1998 regarding Baptist-Memphis's FYE 9/30/94 cost report. Baptist-Memphis' appeal to the PRRB specifically claimed that, with Audit Adjustment No. 49, the Intermediary incorrectly calculated the DSH adjustment due to Baptist-Memphis.

43.    On its own motion, the PRRB reviewed the issue of whether EJR was appropriate or required in this case. On October 25, 2005, the PRRB issued a decision determining that EJR

was inappropriate because the Board was authorized to hear the parties' factual arguments related to PM A-99-62.

44.     On April 26, 2006, the PRRB held an evidentiary hearing to determine whether Baptist-Memphis was entitled, under PM A-99-62, to include Section 1115 Waiver Days for expanded Medicaid populations in the Medicaid component of its Medicare DSH calculation. At the hearing, Baptist-Memphis presented one witness and 34 exhibits. The Intermediary presented no witnesses, but nevertheless was allowed to enter 8 exhibits in the record. On June 29, 2007, the PRRB issued its unanimous decision in favor of Baptist-Memphis, finding that PM A-99-62's Hold Harmless Policy applied to Baptist-Memphis' FYE 9/30/94 cost report because Baptist-Memphis had satisfied the Hold Harmless Policy requirements by filing a jurisdictionally proper appeal before October 15, 1999.

45.     On August 29, 2007, the Administrator reversed the PRRB's decision, both on the merits (as to the applicability of PM A-99-62), and on *res judicata* grounds (ostensibly based on an adverse decision in a separate Medicare "common-issue/related-party" or "CIRP" group appeal in which Baptist-Memphis participated, as discussed in ¶¶47-52, *infra*). As the sole authority in support of his application of *res judicata* as a ground for overturning the PRRB's decision in Baptist-Memphis' favor in the appeal of the FYE 9/30/94 cost report, the Administrator's decision cited to statements made by the Secretary in the Federal Register entry of the final rule establishing expedited judicial review.

46.     Baptist-Memphis timely initiated litigation on it statutory claims in the United States District Court for the District of Columbia (USDC-DC) – within 60 days of receipt of the Administrator's reversal of the PRRB's decision for Baptist-Memphis' FY 1994 individual

appeal as authorized by 42 U.S.C. § 1395oo(f)(1) – in *Baptist Memorial Hospital d/b/a Baptist Memorial Hospital–Memphis v. Leavitt*, case number 1:07-cv-01938-RWR.

**(3)     *BMH-Memphis' FY 1994 Common-Issue/Related-Party Group Appeal***

47.     On or about July 28, 2000, Baptist-Memphis, along with six other hospital providers owned and operated by BMHCC, timely filed a request for a "common-issue/related-party" or "CIRP" group hearing before the PRRB for FY 1994. In the group appeal, the hospitals raised a statutory challenge against CMS' policy under which each hospital's DSH percentage was calculated by using a formula that excluded Section 1115 waiver days from the Medicaid fraction of the DSH calculation for discharges that occurred on or before January 19, 2000.

48.     The other hospitals in the CIRP group did not have similar fact patterns in their procedural history for FY 1994 and, therefore, unlike Baptist-Memphis, they could not make claims for Hold Harmless Relief under PM A-99-62. As a result, Baptist-Memphis had to bring its Hold Harmless Relief claim before the PRRB in an individual appeal, which would not be subject to EJR (as evidenced by the Board's refusal to grant EJR to Baptist-Memphis for FY 1994; *see* ¶43, *supra*).

49.     By letter dated December 9, 2005, the hospitals' CIRP group, with respect to their statutory challenge, filed an EJR request with the PRRB. By letter dated January 4, 2006, the PRRB granted the hospitals' request for EJR for the CIRP group because the Board does not have authority to determine statutory claims.

50.     The hospitals timely initiated litigation on their statutory claims in the United States District Court for the District of Columbia (USDC-DC) – within 60 days of receipt of the

COMPLAINT
Page - 19 -

PRRB's grant of EJR as authorized by 42 U.S.C. § 1395oo(f)(1) – in *Baptist-Memphis Memorial Hospital, Inc. et al. v. Leavitt*, case number 1:06-cv-00437-JR.

51.    On June 27, 2007, the USDC-DC issued a decision in the group litigation in favor of defendant and against the plaintiffs.

52.    On or about August 13, 2007, the plaintiffs in the FY 1994 CIRP group appeal filed a Notice of Appeal with the United States Court of Appeals for the District of Columbia Circuit.

**(4)    *Mandatory Bifurcation of Individual and Group Appeals***

53.    The PRRB is without authority to review "any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy." 42 U.S.C. § 1395oo(f)(1).  Thus, the group appeal, which was based on alleged violations of applicable statutes, was subject to EJR, and with the PRRB's grant of EJR, had to be brought directly before a court for judicial review of the alleged statutory violations.  In contrast, factual arguments based on program memoranda, such as PM A-99-62, must be brought before the PRRB and are not appropriate candidates for EJR.  *See* ¶43, *supra.*  Moreover, the "Board's determination concerning its authority or its lack of a determination is not subject to the Secretary's review under §405.1875." 42 C.F.R. § 405.1842(g)(4).  *See also* 42 U.S.C. § 1395oo(f)(1).

54.    In accordance with 42 C.F.R. §§ 405.1837 and 405.1841(a)(2) (*see* ¶10, *supra*), the PRRB's own instructions provide that if "providers are under common ownership or control and have an issue in common, [they] must file a group appeal if the amount in controversy is $50,000 or more.  These are known as . . . CIRP appeals and are 'mandatory' group appeals."

PRRB Instruction, Part I, §B.I.d.   Nevertheless, if "there are factual differences among the providers, the issue is not a valid group appeal issue." *Id.*

55.     As a direct result of the regulatory requirements and instructions referred to in ¶¶53-54, *supra*, Baptist-Memphis was required to:  (a) participate in a group appeal with the other hospitals on their statutory claim, and bring that claim before a court pursuant to EJR; and, (b) file an individual appeal, based on the facts applicable only to Baptist-Memphis that created a valid claim for Hold Harmless Relief under PM A-99-62 before the PRRB, a claim unavailable to the other hospitals that participated in the statutory CIRP group.

### VII.     Violations of Law and Bases for Reversal of the Secretary's Decision

56.     The scope of the judicial review applicable herein is set forth in the APA, 5 U.S.C § 706, and provides in part:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

A.    **SNF RCL Exception Request**

(1)    **The Administrator's Reversal of the PRRB's Decision in Baptist-Memphis' Favor On the SNF RCL Exception Request is Legally Erroneous, and Thereby Violates the APA, 5 U.S.C. § 706(2).**

57.    The governing regulation, which sets the procedural limits for requests regarding the applicability of the cost limits, makes no distinction between types of NPRs, and provides no basis upon which to limit relief under a SNF RCL exception request. *See* 42 C.F.R. § 413.30; *see also* PRM-I § 2534 and § 2531.1A. The plain language of the regulation and manual provisions state that an RCL exception request must be timely filed (within 180 days) of an NPR. *Id.* The regulatory language contains no limitation on the scope of an exception request timely filed within 180 days of any NPR. Administrator's decision reads into the regulation requirements that do not exist; *i.e.*, that an RCL exception request based on a revised NPR must be limited to the amount of costs positively adjusted. Even if an RCL exception request based on a revised NPR may be limited to only those costs adjusted, the governing regulation and manual provisions do not limit the amount of the exception to only those costs positively adjusted. The Administrator's reversal of the PRRB's decision in favor of Baptist-Memphis violates the APA, 5 U.S.C. § 706(2).

(2)    **The Administrator's Decision Violates the APA, 5 U.S.C. § 706(2), Because the Administrative Record Establishes that Baptist-Memphis Satisfied the Regulatory Requirements for Requesting a SNF RCL Exception.**

58.    The administrative record developed by the PRRB establishes that Baptist-Memphis satisfied the regulatory requirements for requesting a SNF RCL exception. Specifically, Baptist-Memphis (1) timely requested a SNF RCL exception within 180 days of the Intermediary's issuance of the revised NPR for FY 1995 as required by 42 C.F.R. § 413.30(c);

COMPLAINT
Page - 22 -

and (2) proved the elements required for an exception request based on atypical costs resulting from atypical patients as required by 42 C.F.R. § 413.30(e)(1) and PRM-I § 2534 and § 2531.1A (*i.e.*, the revised NPR impacted nearly all of the costs associated with the exception request and these costs exceeded the RCLs). The PRRB concluded that Baptist-Memphis "should be allowed to make an exception request for the full amount from any NPR in which the RCL is at issue." PRRB Dec. No. 2007-D65, at 9. The Administrator's decision denying Baptist – Memphis any RCL exception violates the APA, 5 U.S.C. § 706(2).

**B.    DSH Section 1115 Waiver Days – Hold Harmless (PM A-99-62)**

**(1)    The Administrator's Decision Violates the APA, 5 U.S.C. § 706(2), Because the Administrative Record Establishes that Baptist-Memphis Satisfied Program Memorandum A-99-62 Requirements in FY 1994 and is Thereby Entitled to Hold Harmless Treatment in FY 1995 .**

59.    As set forth in ¶¶39 and 44, *supra*, the PRRB held that Baptist-Memphis is entitled to hold harmless treatment for FY 1995 based on the Board's previous decision that Baptist-Memphis' FY 1994 appeal satisfied PM A-99-62 and the parties' stipulations that the Board's decision for FY 1994 would apply to FY 1995. The administrative record developed by the PRRB for Baptist-Memphis' FY 1994 (PRRB Case No. 98-1942) conclusively establishes that Baptist-Memphis satisfied the Secretary's own two requirements in order to receive Hold Harmless Relief under PM A-99-62. Baptist-Memphis' FY 1994 individual appeal:  (1) raised the issue of the exclusion of these types of days from the Medicare DSH formula; and (2) did so in a jurisdictionally proper appeal that was filed prior to October 15, 1999.

60.    The PRRB record shows, among other things, that Baptist-Memphis timely filed its appeal to the PRRB on March 19, 1998. The request for appeal followed Baptist-Memphis' usual practice of including only a short statement of the issues in its request for hearing, a

COMPLAINT
Page - 23 -

practice that satisfied exactly the then-applicable PRRB requirement of solely giving notice pleading – as set forth in PRM-I § 2921 – by identifying the issue in dispute with a short explanation of the basis for the dispute, the audit adjustment number, and the amount in controversy. The Hospital's request for hearing appealed the Intermediary's Audit Adjustment No. 49 and followed the requirements exactly in that it identified the issue, the challenged audit adjustment number, and the approximate amount in dispute. Audit Adjustment No. 49 excluded Baptist-Memphis' Section 1115 waiver days claimed at the time it filed its cost report. After subsequently acquiring additional data from the state, Baptist-Memphis and the Intermediary stipulated to the exact number of excluded waiver days at the PRRB hearing.

60. The CMS Administrator's determination on the merits finds no support in the undisputed and conclusively established evidence contained in the PRRB record and asserts that Baptist-Memphis did not intend to appeal the exclusion of the Section 1115 expansion waiver days in direct contravention of the only evidence in the record on that point. As a result, the Administrator's determination on the merits "runs counter to the evidence before the agency" and, therefore, violates the APA, 5 U.S.C. § 706(2). *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

**(2)    The October 15, 1999 Appeal Deadline Imposed by CMS in Program Memorandum A-99-62 Violates the APA, 5 U.S.C. § 706(2).**

61. As noted in ¶34, *supra*, on October 15, 1999 the CMS Administrator sent Senator William Roth a letter regarding CMS's intent to provide Hold Harmless Relief to hospitals that had filed timely appeals before the PRRB because of persistent and widespread confusion surrounding the proper treatment of Section 1115 Waiver Days in DSH calculation. Hospitals (such as Baptist-Memphis) were not provided copies or notification of the contents or the

existence of the October 15, 1999 letter. Two months later, in December 1999, CMS issued PM A-99-62 which established an appeal deadline of October 15, 1999. The PRRB found that Baptist-Memphis in its FY 1994 appeal "clearly addressed the TennCare days issue in its preliminary position paper on November 29, 1999, prior to the issuance of the PM in December 1999." PRRB Dec. No. 2007-D43, at 7. The Board also found that the Intermediary did not provide Tennessee hospitals with the PM until March of 2000 and, "[t]hus, the Provider's first actual notice of the PM in March 2000 was significantly after the Provider had filed not only its appeal but also its preliminary position paper." *Id.* As a result, the PRRB concluded that "the Provider filed a jurisdictionally proper appeal to the Board before the October 15, 1999 deadline established by the PM." *Id.* Under these circumstances, the Secretary's decision to hinge Hold Harmless Relief on an October 15, 1999 deadline when hospitals had no notice of the availability of such relief is arbitrary, capricious, unreasonable, and otherwise not in accordance with law.

**(3)    CMS's Issuance of Program Memorandum A-99-62 Contravened the APA's Requirement of Notice-and-Comment Rulemaking.**

62.    In promulgating and interpreting PM A-99-62, CMS announced requirements applicable to all similarly situated hospitals.

63.    The requirements of PM A-99-62, and the policy statement therein, established a legal standard governing the scope of benefits or the payment for services to hospitals that treat a disproportionate share of low income patients and the payment adjustment set forth in Medicaid law.

64.    The Secretary failed to promulgate this substantive legal standard by regulation through notice-and-comment rulemaking, and in so doing violated 42 U.S.C. § 1395hh(a)(2) and the dictates of the APA, 5 U.S.C. §§ 553, 706(2)(D).

COMPLAINT
Page - 25 -

**(4)**    **The Administrator's Decision – Based on Res Judicata – is Factually and Legally Erroneous, and is Thereby Arbitrary, Capricious, and Otherwise Not in Accordance with Law.**

65.    As explained in ¶¶41-55, *supra*, regulatory requirements and instructions required Baptist-Memphis to: (a) file a CIRP group appeal for FY 1994 with other hospitals owned and operated by BMHCC on the claim that the Secretary's refusal to include expanded Section 1115 expanded Medicaid-eligible waiver days in the DSH calculation prior to January 20, 2000 violated the applicable statutes, and bring that statutory legal claim before a court pursuant to EJR as granted by the PRRB; and (b) file an individual appeal for FY 1994 based on facts applicable only to Baptist-Memphis that created a valid claim for Hold Harmless Relief pursuant PM A-99-62, a claim unavailable to the other BMHCC hospitals, and bring that factual claim before the PRRB as EJR did not apply.

66.    *Res judicata* applies only where a party has had a full and fair opportunity to litigate its claim. Baptist-Memphis' fact-based claim for Hold Harmless Relief had to be filed with the PRRB as an individual appeal. Therefore, application of *res judicata* to the court decision on the group appeal's statutory claim would deny Baptist-Memphis the opportunity to fully and fairly litigate its separate and distinct individual claim to Hold Harmless Relief under PM A-99-62.

67.    Accordingly, the doctrine of *res judicata* does not apply, and the Administrator's application of the doctrine is arbitrary, capricious, and otherwise not in accordance with law.

## X.    Requested Relief

**WHEREFORE,** Baptist-Memphis respectfully requests that this Court:

a.    Vacate the Defendant Secretary's action as being in violation of the APA, 5 U.S.C. § 706, because it is:

COMPLAINT
Page - 26 -

     i.      arbitrary, capricious, an abuse of discretion and not in accordance with the law;

     ii.     without observance of procedure required by law; and/or

     iii.    unsupported by substantial evidence in the record.

b.     Hold in accordance with the PRRB's decision in this case that the governing regulation entitles a provider to a full exception from either an original or revised NPR, and remand the case to the Secretary with an order compelling him to pay Baptist-Memphis in accordance with the parties' stipulation that the correct amount of the full exception is $83.01, resulting in additional reimbursement of $750,659. Alternatively, hold that an exception request from a revised NPR may be limited to any costs adjusted, whether positively or negatively, and remand to the Secretary with an order compelling him to pay Baptist-Memphis in accordance with the parties' stipulation that the correct amount of the exception is $42.79, resulting in additional reimbursement of $386.950.

c.     Hold that Baptist-Memphis met the requirements of PM A-99-62 by virtue of its March 19, 1998 individual appeal for FY 1994 challenging the Intermediary's audit adjustment excluding the Section 1115 waiver days, and remand the case to the Secretary with an order compelling him to include the disallowed TennCare Days in the Medicaid Proxy of the Medicare DSH calculation for purposes of determining Baptist-Memphis' Medicare DSH payment for FY 1995. Alternatively, hold that the October 15, 1999 deadline established by PM A-99-62 was arbitrary and capricious given the PRRB's findings that Baptist-Memphis (1) had no prior notice of the October 15, 1999 date; (2) on March 19, 1998 appealed the FY 1994 audit adjustment that excluded the claimed Section 1115 waiver days; and (3) on November 29, 1999 expressly

addressed the specific issue of the Intermediary's exclusion of the claimed Section 1115 waiver

days in its FY 1994 Preliminary Position Paper before CMS's issuance of the PM in December

1999.

      d.     Order the Secretary to pay Baptist-Memphis interest, in accordance with 42

U.S.C. §1395oo(f)(2), on the payments resulting from the Court's order; and

      e.     Grant to Baptist-Memphis such other relief in law and/or equity as the Court may

deem just and proper.

Dated:  December *13*, 2007

QUAGLIANO & SEEGER, P.C.

By _____
Julie Quagliano, Esq., D.C. Bar No. 393428
Michael C. Zisa, Esq.,  D.C. Bar No. 467724
2620 P Street, N.W.
Washington, D.C. 20007
Phone: (202) 822-8838
Fax: (202) 822-6982
Email: quagliano@quagseeg.com

BENNETT BIGELOW & LEEDOM, P.S.

By _____
Sanford E. Pitler, Esq., WSBA No. 16567
Kelly A. Thomas, Esq., WSBA No. 33191
*Pro Hac Vice Motions Pending*
1700 Seventh Avenue, Suite 1900
Seattle, WA  98101
Telephone: (206) 622-5511
Email: pitler@bbllaw.com

W:\Wdclient\1789\00050\MM740903.DOC

COMPLAINT
Page - 28 -

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Baptist Memorial Hospital d/b/a<br>Baptist Memorial Hospital Memphis | Michael O. Leavitt, Secretary of U.S. Dept. of Health<br>and Human Services |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**  Shelby
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Dist. of Columbia
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

¹ Julie Quagliano, Esq.
² Michael C. Zisa, Esq.
³ Quagliano & Seeger, P.C.
⁴ 2620 P Street, N.W.
⁵ Washington, D.C. 20007
⁶ Tel: (202) 822-6838
⁷ Fax: (202) 822-6862
⁸ Email: quagliano@quegseeg.com
⁹ Email: zisa@quegseeg.com

**ATTORNEYS (IF KNOWN)**

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place<br>of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place<br>of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a<br>Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ **A. Antitrust** | ○ **B. Personal Injury/Malpractice** | ○ **C. Administrative Agency Review** | ○ **D. Temporary Restraining Order/Preliminary Injunction** |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☒ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If<br>Administrative Agency is Involved) | Any nature of suit from any category may<br>be selected for this category of case<br>assignment.<br><br>*(If Antitrust, then A governs)* |

---

| ○ **E. General Civil (Other)** | **OR** | ○ **F. Pro Se General Civil** | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or<br>defendant<br>☐ 871 IRS-Third Party 26<br>USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure<br>of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational<br>Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC<br>Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced &<br>Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/<br>Exchange<br>☐ 875 Customer Challenge 12 USC<br>3410<br>☐ 900 Appeal of fee determination<br>under equal access to Justice<br>☐ 950 Constitutionality of State<br>Statutes<br>☐ 890 Other Statutory Actions (if<br>not administrative agency<br>review or Privacy Act |

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 U.S.C. § 1395oo(f)(1) and 5 U.S.C. §§ 551 et seq.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint<br>JURY DEMAND:   YES ☐   NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒  NO ☐    If yes, please complete related case form.

DATE  12-13-07    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.